IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2014 JUN 19 P 3: 46

CLERK _____
SO. DIST. OF GA.

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.  ) | CR 114-018 |
| ) | |
| VARTRON MISCKO NERO ) | |

# MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendant Vartron Miscko Nero, charged in a one-count indictment as a felon in possession of a firearm, moves to suppress the weapon and all other evidence seized during a July 30, 2013 search of a vehicle in which he was a passenger. (Doc. no. 12.) Having considered all arguments and evidence presented in the briefs and at the June 2, 2014 evidentiary hearing, the Court **REPORTS** and **RECOMMENDS** that Defendant's motion to suppress be **DENIED**.

## I. THE SOLE ISSUE TO BE DETERMINED

Richmond County Deputy William Hultman seized the weapon and related evidence from a blue Chevrolet Impala that he stopped for speeding and a possible window tint violation. During the traffic stop, Deputy Hultman searched the vehicle after purportedly detecting the smell of burnt marijuana wafting from the open driver's side door. Defendant, a passenger in the Impala, concedes the propriety of the initial traffic stop because the driver admitted to speeding. Defendant also concedes that he has no standing to challenge the vehicle search on Fourth Amendment grounds because he did not own the vehicle and thus did not have an expectation of privacy within the vehicle.

Defendant's sole contention is that Deputy Hultman falsely claimed he smelled burnt marijuana so that he could articulate a reasonable, articulable suspicion of criminal activity that would justify prolonging the traffic stop and searching the vehicle. The government concedes that Defendant has Fourth Amendment standing to challenge the vehicle search on this basis. See Brendlin v. California, 551 U.S. 249, 254-56 (2007); see also Court's recording system, *For the Record*, (hereinafter "FTR") 2:15.26-:18.10. The sole issue, therefore, is whether Deputy Hultman lied when he testified that he smelled marijuana wafting from the vehicle before he conducted the search.

## II.  FACTUAL BACKGROUND

Careful consideration of the suppression motion requires a detailed understanding of the traffic stop as described by Deputy Hultman on direct examination, the gaps and inconsistencies in Deputy Hultman's memory highlighted during his cross examination, and the competing version of events offered by the defense witness, Ms. Amelia Marie Williams, during her testimony.

### A.  Deputy Hultman's Description of the Traffic Stop on Direct Examination.

Deputy Hultman is an eight-year veteran of the Richmond County Sheriff's Office and works in its Crime Suppression Unit. (FTR 2:19.10-.28.) At approximately noon on July 30, 2013, while patrolling the Quail Hollow subdivision, Deputy Hultman stopped a blue Chevrolet Impala for speeding and a potential window tint violation. (FTR 2:19.10-:21.52.) Defendant was a passenger in the Impala, and the driver was his girlfriend, Ms. Williams. (FTR 3:42.19-.21; 3:54.48-.56.) Deputy Hultman approached the driver's side door, explained through the open window to Ms. Williams why he

2

stopped the vehicle, and obtained her license. (FTR 3:07.30.) Ms. Williams acknowledged that she had been speeding. (FTR 2:21.25-.44; 3:43.26-.54.) The vehicle belonged to Ms. Williams' sister, Temeshea Williams. (FTR 3:42.12-.14.)

Still talking through the driver's side window, Deputy Hultman requested identification from Defendant, who had none. (FTR 2:21.47-.58; 3:07.39-.42.) Deputy Hultman noticed that Defendant appeared nervous and was staring straight ahead. (Id.) Walking to the passenger's side, Deputy Hultman asked Defendant again for identification, directed Defendant to exit the car, patted down Defendant, and placed Defendant in the patrol car. (FTR 2:22.10-.12; 3:07.51-:08.04.) Deputy Hultman explained during the hearing that he placed Defendant in the patrol car as a routine matter of safety because he needed to identify Defendant and because there were two occupants of the vehicle and only one law enforcement officer. (FTR 2:22.25-.34.) Once in the patrol car, Defendant provided his name and date of birth. (FTR 3:08.09-.30.)

Deputy Hultman walked back to the Impala to speak with Ms. Williams, who was now standing outside of the Impala with the door open. (FTR 3:08.33-:09.35.) At this moment, Deputy Hultman claims to have smelled the odor of burnt marijuana for the first time. (FTR 2:24.55.) Approximately two to three minutes had passed between the initial stop and the moment when Deputy Hultman smelled the marijuana. (FTR 2:45.55-.59.)

Deputy Hultman told Ms. Williams that he smelled marijuana and informed her that he was going to search the vehicle. (FTR 3:09.06-.10.) Inside the vehicle, Deputy Hultman found Xanax pills in the center console, a Glock 27 pistol with live ammunition under the passenger seat where Defendant had been sitting, and remnants of marijuana

3

cigars in the ashtray. (FTR 3:09.20-.31.) Deputy Hultman did not collect the marijuana remnants for evidence because they were so small as to be inconsequential and he had no intention of charging anyone with marijuana possession. (FTR 2:27.07-.26.; 2:43.06-.51.)

Once Deputy Hultman found the Xanax and firearm, he advised Ms. Williams and Defendant of their Miranda rights. (FTR 3:09.00-.37.) Ms. Williams said she knew nothing about the contraband. (FTR 3:09.40-.43.) Defendant initially claimed ownership of the firearm but not the Xanax. (FTR 3:09.44-.51.) When Deputy Hultman questioned Defendant about the odor of burnt marijuana, Defendant suggested that someone could have smoked marijuana in or near the vehicle the night before when Temeshea Williams, the vehicle owner and sister of Amelia Williams, had taken friends out in the Impala to party for the night. (FTR 2:28.30-.34; 3:55.46-:56.03.)

Deputy Hultman explained that both Ms. Williams and Defendant would be charged with possession of the Xanax pills because they were found in a commonly accessible area. (FTR 3:09.50-:10.10.) When Ms. Williams became upset, Defendant claimed ownership of the pills as well, then confirmed in writing that the pills and firearm were his. (FTR 3:10.11-.37.) The statement accurately described the location of these items in the vehicle even though Defendant had been in the patrol car at the time of the search. (Id.)

Deputy Hultman verified the information on Ms. Williams' license and that Defendant had provided his correct identification information. (FTR 3:10.38-.44.) He also determined by radio that Defendant was a felon and the firearm was stolen. (FTR

4

3:10.44-:11.20.) Defendant stated that he had purchased the firearm from an unknown man for $100. (FTR 3:11.21-.37.) After notifying Defendant that he would face a charge related to the firearm, Deputy Hultman left Defendant in the patrol car and returned to Ms. Williams to issue a verbal warning and release the vehicle to her. (FTR 3:11.38-.42.) Deputy Hultman tested the driver's window tint prior to releasing the vehicle to Ms. Williams and found that it was darker than Georgia law allows. (FTR 3:11.58-:12.08.) Normally, Deputy Hultman would have conducted the tint test immediately after checking the driver's license information, but he did not because the contraband took precedence over the window tint. (FTR 3:12.55-:13.47.)

### B. Weaknesses in Deputy Hultman's Testimony, Highlighted in Cross Examination.

In a thorough and sifting cross examination, defense counsel highlighted a number of gaps and inconsistencies in Deputy Hultman's memory of the traffic stop, especially when viewed in the light of testimony Deputy Hultman gave at a suppression hearing in Richmond County Superior Court on October 31, 2013. First, defense counsel elicited a concession from Deputy Hultman that he had absolutely no memory of testifying at the October 2013 hearing despite the fact that he testified at length. (FTR 3:33.33-.46.) This, defense counsel argued, called into question Deputy Hultman's memory in general, and in particular his memory of events that occurred nearly one year ago.

Second, at the suppression hearing, Deputy Hultman testified that Ms. Williams was out of the vehicle with the door open when he first smelled the marijuana. (FTR 3:08.33-:09.35.) In October 2013, however, Deputy Hultman testified that Ms. Williams

5

was still in the vehicle with the door closed and the window open when he first smelled the marijuana, and that Ms. Williams stepped out of the vehicle only when he asked her to do so, after he smelled the marijuana. (Ex. A, attached hereto, p. 2, lines 10-15.)

Third, defense counsel pointed to the evolving nature of Deputy Hultman's factual recitations when one compares the rather barebones factual summary in his original incident report of July 31, 2013 with the detailed sworn statement he signed more than three months later on November 11, 2013. In the incident report, Deputy Hultman wrote that he searched the vehicle "due to smelling an odor of marijuana." (Doc. no. 18, Ex. 1, p. 2.) In the sworn statement, Deputy Hultman wrote that he "could smell an odor of burnt marijuana coming from inside the vehicle," that he searched the vehicle "due to the odor of marijuana," and that he found in the ashtray "small partial pieces of what appeared to be marijuana cigars." (Id., Ex. 3.) Deputy Hultman conceded on cross examination that the incident report did not mention all those details listed in the sworn statement. Defense counsel questions Deputy Hultman's ability to remember these details at the time of his sworn statement more than three months after the traffic stop, particularly when he cannot remember today the fact that he testified in state court seven months ago in this same case.

Addressing these arguments, Deputy Hultman testified that he did not include these details in the original incident report because that document is intended to be a brief summary written the day of the events in question that discusses only the facts relevant to the offenses being charged, and neither Defendant nor Ms. Williams was charged with marijuana possession. (FTR 2:31.03-.20; 2:32.23-.38; 2:53.36-:54.20.) In contrast, a

6

sworn statement is only prepared when investigators later request a more detailed explanation of events. (FTR 2:57.17-.28.) In this case, Deputy Hultman prepared the written statement at the request of Special Agent Rhodes with the Department of Alcohol, Tobacco, Firearms, and Explosives. (FTR 2:31.49-.58; 2:46.33-.43.)

With respect to why the initial report did not specify that the smell was burnt marijuana, Deputy Hultman explained that officers commonly refer to marijuana generally when reporting the odor and do not bother to specify whether the smell is of the raw or burnt type. (FTR 2:30.00-.12; 3:14.48-.52.) He also testified that he has training and experience with narcotics by virtue of his position on the Crime Suppression Unit and having obtained his certification from marijuana examiner's school; he often encounters the smell of marijuana several times a day in the course of his work. (FTR 2:26.10-.52.)

### C. Ms. Williams' Description of the Traffic Stop.

Ms. Williams, who was Defendant's live-in girlfriend at the time, testified that on July 30 she was driving her sister's vehicle with Defendant as a passenger. (FTR 3:42.14-.21.) Deputy Hultman stopped her at 10:30 or 11:00 a.m. for speeding and a window tint violation. (FTR 3:42.14-:43.23; 3:50.50-:51.06.) When Deputy Hultman came to her window, she acknowledged she had been speeding. (FTR 3:43.26-.54.) The deputy took her license back to his patrol car for an identity check, then returned and asked Defendant for identification. (FTR 3:44.06-:44.34.) When Defendant provided his name and social security number, Deputy Hultman returned to his patrol car to check this information. (Id.)

When Deputy Hultman returned to the Impala, he said that he could not verify Defendant's identity and asked Defendant to exit the vehicle and call for someone to bring proof of identification to the scene. (FTR 3:44.37-.44.) Deputy Hultman escorted Defendant back to the patrol car and returned to Ms. Williams in the Impala approximately three minutes later. (FTR 3:44.47-:45.10.) Ms. Williams estimated that approximately fifteen minutes had elapsed since the initiation of the traffic stop, but there had yet to be any mention of marijuana. (FTR 3:45.32-:45.53.)

In keeping with her concession that she was having a hard time remembering the order of events "because it had been so long," (FTR 3:45.22-.30), Ms. Williams provided two versions of the events that occurred next. When questioned by defense counsel, she stated that Deputy Hultman asked her while she was still in the vehicle if he could search. She asked why, and he said that he smelled burnt marijuana. (FTR 3:45.59-:46.10.) Even though she had not consented to a search, Deputy Hultman opened the door, Ms. Williams exited the vehicle, and Deputy Hultman conducted his search. (FTR 3:46.11-.18; 3:47.24-.26) When questioned by the government, Ms. Williams testified that she did not ask why the deputy wanted to search, but instead simply refused to consent. (FTR 3:53.30-.36.) Deputy Hultman then opened her car door and stated that he smelled burnt marijuana, then conducted the search. (FTR 3:53.14-.42.) The obvious inference of either version is that Deputy Hultman lied when he said that he smelled burnt marijuana, in response to her reluctance or refusal to consent, so that he had a legal justification for searching the vehicle.

8

Upon conducting his search, the deputy found the Xanax pills and firearm, but he did not find any marijuana. (FTR 3:46.17-.41.) When the deputy found the Xanax, Ms. Williams explained her sister Temeshea had a prescription for that drug. (FTR 3:47.33-.45.) The deputy also asked about the firearm, but never mentioned marijuana. (FTR 3:47.48-.56.) Ms. Williams was not issued any tickets, but was verbally warned about her window tint. (FTR 3:47.58-:48.12.) According to Ms. Williams, neither the Xanax nor the firearm belonged to Defendant, but he took responsibility for them because he did not want to cause trouble for Ms. Williams' pending graduation from a nursing program. (FTR 3:54.17-.44.)

Ms. Williams confirmed that, just as Defendant had explained to Deputy Hultman, her sister had gone out with friends in the Impala on the night prior to the traffic stop. (FTR 3:48.19-:49.07; 3:58.30-.33.) Because Ms. Williams was not in the vehicle that night with her sister and her friends, there may have been things in the vehicle of which she was not aware. (Id.) Ms. Williams does not know the friends with whom her sister had gone out but has never seen her sister's friends smoke marijuana, and she is sure that her sister does not smoke marijuana. (FTR 3:56.25-.59; 3:57.23-.27.) She is not aware if her sister has a history of prior drug charges. (FTR 3:55.23-.33.) Ms. Williams also testified that she did not see any marijuana in the ashtray of her sister's vehicle because there is no ashtray of any kind in that vehicle, and she has never seen or smelled burnt marijuana in her sister's vehicle or home. (FTR 3:57.00-.26; 3:57.49-:58.02.) Ms. Williams and Defendant lived with Ms. Williams' sister. (FTR 3:54.54-.58.)

At the time of the search, Ms. Williams was on probation but she cannot remember for what. (FTR 3:49.27-.55.) She had a host of charges running concurrently for criminal trespass, speeding, and "a lot of different other things," but none of the charges were felonies or involved drugs. (FTR 3:49.48-:50.20.) Ms. Williams was likewise uncertain of when she was charged with criminal trespass, any time from 2005 to 2007, but she was certain that her probation ended on November 20, 2013. (FTR 3:49.32-.34; 3:50.27-.29.)

## III. DISCUSSION

### A. Courts Have Long Held That An Officer's Detection of Marijuana Odor During a Traffic Stop Justifies Extending the Duration of the Stop.

"The Fourth Amendment protects individuals from unreasonable search and seizure." U.S. v. Chanthasouxat, 342 F.3d 1271, 1275 (11th Cir. 2003); see U.S. Const. amend. IV. A traffic stop "is a seizure within the meaning of the Fourth Amendment," U.S. v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001), but such a stop is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with Terry, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed.2d 889." U.S. v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008) (*per curiam*) (citing Chanthasouxat, 342 F.3d at 1275). "Because a routine traffic stop is only a limited form of seizure, it is more analogous to an investigative detention than a custodial arrest[, and] [t]herefore, we analyze the legality of these stops under the standard articulated in Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed.2d 889 (1968)." Purcell, 236 F.3d at 1277 (citations omitted). The reasonableness of an investigative stop turns on two inquiries: 1) whether the stop was reasonable at its inception, and 2) whether the stop became

unreasonable in its scope or duration. See U.S. v. Street, 472 F.3d 1298, 1306 (11th Cir. 2006); see also U.S. v. Acosta, 363 F.3d 1141, 1144-45 (11th Cir 2004). Thus, an "officer's actions during a traffic stop must be 'reasonably related in *scope* to the circumstances which justified the interference in the first place.'" Purcell, 236 F.3d at 1277.

Likewise, "the *duration* of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop." Id. The Supreme Court has specifically refused to set a *per se* time limit on Terry stops, and instead requires an examination of whether law enforcement officials diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. U.S. v. Place, 462 U.S. 696, 709 n.10 (1983); U.S. v. Sharpe, 470 U.S. 675, 686 (1985). The Eleventh Circuit has ruled fourteen to seventeen minutes is not an unreasonable amount of time for a traffic stop and has in fact approved much longer traffic stops. Purcell, 236 F.3d at 1279; U.S. v. Hernandez, 418 F.3d 1206, 1212 n.7 (11th Cir. 2005).

Necessary tasks that are considered within the scope of the traffic stop include investigating the driver's license and vehicle registration through computer checks, running a computer check for outstanding warrants of the occupants, and requesting consent to conduct a search. See, e.g., U.S. v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003); U.S. v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999). Once an officer completes all of the various and sundry tasks that fall within the scope of a routine traffic stop, "continuing detention of the vehicle's occupants is authorized under the Fourth Amendment only if the officer can point to specific and articulable facts which, taken

11

together with rational inference from those facts, reasonably warrant the intrusion." U.S. v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999) (citations and quotation marks omitted). Stated otherwise, a traffic stop may not last "any longer than necessary to process the traffic violation" *unless* there is articulable suspicion of other illegal activity. U.S. v. Holloman, 113 F.3d 192, 196 (11th Cir. 1997) (*per curiam*); see also Pruitt, 174 F.3d at 1220 ("[T]he officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring."); U.S. v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991) (after effectuating legal stop, officer has a duty to investigate suspicious circumstances).

Here, it is undisputed that (1) Deputy Hultman was justified in stopping the Impala for speeding and a possible window tint violation; (2) all of the tasks he completed before smelling the burnt marijuana fall comfortably within the range of tasks reasonably related to the traffic stop, and he completed them within a reasonable time frame of three to fifteen minutes, according to estimates by Deputy Hultman and Ms. Williams, respectively; and (3) Deputy Hultman had not completed the traffic stop at the time he claims to have smelled burnt marijuana, but instead was in the process of checking Ms. Williams' license and had not yet verified Defendant's identification information.

Defendant argues that Deputy Hultman impermissibly exceeded the scope of the traffic stop and its reasonable duration when he interrupted his completion of the routine traffic stop to conduct a search of the vehicle. Defendant claims that Deputy Hultman never smelled marijuana, but instead concocted this falsity so that he could articulate a

12

reasonable suspicion of criminal activity that would justify an extension of the traffic stop to conduct a vehicle search. Stated more simply, Defendant does not challenge the time of his detention leading up to the point that Deputy Hultman smelled the odor of burnt marijuana. He only challenges the time his detention was extended to allow for the search of the vehicle because he does not believe the deputy smelled marijuana.

Courts have long held that an officer's detection of marijuana odor during a traffic stop provides reasonable suspicion of criminal activity that justifies extending the duration of the traffic stop. U.S. v. White, 593 F.3d 1199, 1203 (11th Cir. 2010) (citing Bryan v. Spillman, 217 F. App'x 882, 885 (11th Cir. 2007) (*per curiam*) and U.S. v. Garcia, 592 F.2d 259, 260 (5th Cir. 1979) (*per curiam*)); U.S. v. Salley, 341 F. App'x 498, 500 (11th Cir. 2009) (*per curiam*) (citing U.S. v. Griffin, 109 F.3d 706, 707-08 (11th Cir. 1997) (finding reasonable suspicion authorized "slightly prolonged" detention to investigate). "Reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." U.S. v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007).

Although Defendant has no Fourth Amendment standing to challenge probable cause for the search of the vehicle based on ownership rights or an expectation of privacy, it is important to note that an officer's detection of marijuana odor does satisfy the higher standard of probable cause to justify a vehicle search without consent under the Fourth Amendment. U.S. v. Rivera, 595 F.2d 1095, 1099 (5th Cir. 1979)[1](citing U.S.

---

[1]Under Bonner v. City of Prichard, the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions that were handed down prior to the close of business

13

v. Ogden, 572 F.2d 501, 502 (5th Cir. 1978) (*per curiam*)); U.S. v. Garza, 539 F.2d 381, 382 (5th Cir. 1976) (*per curiam*) ("[T]he odor of marijuana emanating from the vehicle gave the officer probable cause to conduct [a] search."); see also U.S. v. Tobin, 923 F.2d 1506, 1512 (11th Cir. 1991) ("There is no doubt that the agent's suspicions rose to the level of probable cause when, as the door stood open, he detected what he knew from his law enforcement experience to be the odor of marijuana."); U.S. v. Lueck, 678 F.2d 895, 903 (11th Cir. 1982).

Because the Court finds credible Deputy Hultman's testimony that he smelled the odor of burnt marijuana prior to searching the vehicle, as explained below, he had reasonable suspicion of criminal activity that justified extending the duration of the traffic stop for the purpose of conducting the vehicle search.

### B. The Court Finds that Deputy Hultman Did Smell Marijuana Prior to Searching the Impala.

Before discussing why the Court finds credible Deputy Hultman's testimony that he searched the vehicle because he smelled burnt marijuana, it is best to frame the discussion in the legal context of how courts make credibility determinations. "Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." U.S v. Williams, 731 F.3d 1222, 1230 (11th Cir. 2013) (citing U.S. v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002)); see also

---

on September 30, 1981. 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

U.S. v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are within the province of the fact finder).

In making its credibility determination, the Court must take into consideration not only the interests of the witness, but also "the internal consistency of the [witness's] testimony, or his candor or demeanor on the stand." Ramirez-Chilel, 289 F.3d at 749, 750 (citation omitted); see also U.S. v. Wein, No. CRIM. 05-317, 2006 WL 2128155, at *3 (W.D. Pa. July 27, 2006) (listing "customary techniques to ascertain the credibility of the witnesses, including but not limited to: appearance and conduct of each witness, the manner in which he testified, the character of the testimony given, his intelligence, motive, state of mind, and demeanor while on the stand"). A reviewing court must accept the fact finder's determination "'unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable fact finder could accept it.'" Ramirez-Chilel, 289 F.3d at 749 (citation omitted).

Here, the Court finds entirely credible the testimony of Deputy Hultman that he smelled the odor of burnt marijuana prior to searching the Impala. Ms. Williams conceded that Deputy Hultman first mentioned the odor of marijuana when he returned to the Impala for the second time after putting Defendant in the patrol car, which is entirely consistent with Deputy Hultman's testimony. Moreover, Deputy Hultman testified that he found the source of the odor in the Impala's ashtray, where he found remnants of marijuana cigars. According to Deputy Hultman, Defendant gave a plausible explanation concerning why the remnants were in the ashtray, i.e. Temeshea Williams had taken the Impala out with her friends the night before to party. Importantly, Amelia Williams

confirmed this critical fact during her hearing testimony when she conceded that her sister had gone out partying with her friends the night before in the Impala. Not only does Ms. Williams' testimony in this regard establish a reason why the vehicle would smell like burnt marijuana and contain marijuana remnants in the ashtray, but it also confirms Deputy Hultman's testimony that he raised the issue with Defendant at the scene and was given the identical explanation.

In every account that Deputy Hultman has given of the traffic stop, he has steadfastly stated that he smelled marijuana on the driver's side of the Impala before beginning his search of the vehicle. This includes his initial report, testimony in state court, written statement, and more than one hour of candid but stressful testimony before this Court at the suppression hearing. Moreover, Deputy Hultman is an eight-year police veteran with a certification from marijuana examiner's school who encounters the smell of marijuana several times a day in the course of his work.

To be sure, there is fodder for cross examination with respect to less important details when one compares the multiple statements that Deputy Hultman has given to date, as detailed in section II.B, supra. But Deputy Hultman has been consistent from the outset concerning the pivotal issue.

In addition, Deputy Hultman gave satisfactory, rational explanations for the majority of points raised during his cross examination. It makes sense that his initial report of the traffic stop focused on the charged offenses and did not contain any detailed account of other facts, such as the presence of marijuana remnants in the ashtray. It also makes sense that Deputy Hultman did not bother to remove the minute remnants of burnt

16

marijuana from the ashtray, since he never intended to charge anyone with marijuana possession and the remnants were useless to a drug user.[2] Also reasonable is Deputy Hultman's explanation that his sworn statement is much more detailed than his initial report because Agent Rhodes requested a lengthier recitation of the traffic stop. See U.S. v. Smith, 688 F.3d 730, 734 n.10 (11th Cir. 2012) (noting that the omission of details in an incident report is not sufficient to render an officer's testimony facially implausible).

After careful scrutiny of Deputy Hultman's testimony, as well as his demeanor, state of mind, and motives, the Court finds that he is candid and telling the truth to the best of his abilities. Ramirez-Chilel, 289 F.3d at 749, 750 (citation omitted); see also Wein, 2006 WL 2128155, at *3 (listing customary techniques to ascertain the credibility of witnesses).

Defense counsel also attempted to prove that Deputy Hultman lied about the detection of marijuana odor through the testimony of Ms. Williams. After careful scrutiny of Ms. Williams' testimony, as well as her demeanor, state of mind, and motives, the Court finds that she is not as credible of a witness as Deputy Hultman. Ms. Williams had a strong motive for providing helpful testimony to Defendant because (1) she was Defendant's live-in girlfriend at the time of the traffic stop; and (2) she testified that Defendant only claimed responsibility for the Xanax and the firearm so that she would

---

[2] All that is necessary to justify a vehicle search is the officer's detection of the marijuana odor, regardless of whether marijuana is actually found. See, e.g., Rivera, 595 F.2d at 1099; Garza, 539 F.2d at 381; see also U.S. v. Smith, 481 F. App'x 540, 544 n.1 (11th Cir. 2012) (per curiam) (rejecting argument that amount of marijuana, two grams, found in car "was not substantial enough to create enough odor" for the officer to detect it during traffic stop).

avoid criminal charges that might impact her graduation from a nursing program.

Ms. Williams' memory was selective. For instance, she could not remember why she had been on probation but confidently asserted the exact date her probation ended. She hedged on testimony concerning whether her sister had a history of prior drug charges, but she unequivocally stated that her sister did not smoke marijuana and had never displayed anything in her house or vehicle suggesting the presence of marijuana.

Her version of the events critical to the suppression issue changed during the course of the suppression hearing. On direct examination, Ms. Williams stated Deputy Hultman told her that he smelled marijuana after she asked why he wanted to search the vehicle but while she was still sitting in the vehicle. When asked on cross examination, she stated that she refused consent, Deputy Hultman opened her door, and then he told her he smelled burnt marijuana. Ms. Williams also testified that even though Defendant had given his correct name and social security number to Deputy Hultman, the deputy stated that Defendant's name did not show up in the computer system, an illogical statement given that Defendant had a prior felony record. When confronted with such discrepancies, Ms. Williams conceded she was having a hard time remembering the events of the traffic stop "because it had been so long."

For all of these reasons, the Court finds that Deputy Hultman detected the odor of marijuana when he approached the driver's side of the Impala after putting Defendant in the patrol car, and that he found remnants of burnt marijuana in the Impala's ashtray. The government has thus carried its burden of proving that Deputy Hultman had reasonable, articulable suspicion of criminal activity that justified extension of the traffic

stop beyond its original purpose to conduct the vehicle search.

## IV. CONCLUSION

For all of the reasons stated above, the Court **REPORTS** and **RECOMMENDS** that Defendant's motion to suppress be **DENIED**. (Doc. no. 12.)

SO REPORTED and RECOMMENDED this 19th day of June, 2014, at Augusta, Georgia.

*[signature]*
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA